Filed 7/11/14  P. v. Tolbert CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DAYMEN QUIONEL TOLBERT, et al.,<br><br>    Defendant and Appellant. | D065262<br><br><br><br>(Super. Ct. No. RIF1104741) |

APPEAL from a judgment of the Superior Court of Riverside, Gary B. Tranbarger, Judge.  Affirmed.

Jeffrey S. Kross, under appointment by the Court of Appeal, for Defendant and Appellant Daymen Quionel Tolbert.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant Dwayne Harold Brady.

Gregory Marshall, under appointment by the Court of Appeal, for Defendant and Appellant Daniel Delshawn Green.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Meagan J. Beale and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

The jury convicted Dwayne Harold Brady, Daniel Delshawn Green, and Daymen Quionel Tolbert (Brady, Green, and Tolbert collectively Appellants) of one count of active participation in a street gang (Pen. Code,[1] § 186.22, subd. (a); count 4.)  The jury also convicted Brady of simple assault (§ 240; count 2); and assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1); count 3).

In addition, the jury found true the enhancement that count 3 was committed for the benefit of or at the direction of or in association with a criminal street gang, within the meaning of section 186.22, subdivision (b).

Brady subsequently admitted a prior serious felony conviction (§ 667, subd. (a)) and a prior strike conviction (§§ 667, subds. (c), (e)(1)).  The court sentenced him to prison for 14 years, comprised of the midterm of three years for count 3, doubled to six years as a second strike conviction; three years for the gang enhancement; and five years for the prior serious felony enhancement.  His two-year sentence under count 4 was stayed under section 654.  Brady also received a concurrent six-month county jail term for count 2.

The court sentenced Tolbert to prison for three years under count 4.

---

[1]    Statutory references are to the Penal Code unless otherwise specified.

2

The court placed Green on probation and ordered, among other conditions, that Green serve 270 days in custody.

Brady appeals, contending (1) his conviction under count 2 should be reversed because it is a lesser included offense of count 3; (2) the court erred in failing to stay his sentence under count 2; (3) the court provided the jury with an ambiguous instruction on the elements of count 4; (4) his conviction under count 4 is not supported by substantial evidence; and (5) his convictions on all counts should be reversed because of juror misconduct.

Tolbert and Green appeal, arguing their convictions under count 4 are not supported by substantial evidence.

We determine that Brady forfeited his appeal as to the ambiguity of the jury instructions. We conclude all other contentions are without merit. Accordingly, we affirm.

FACTUAL BACKGROUND

Prosecution

During the afternoon, Mario Vasquez was riding his bicycle from the Youth Opportunity Center on Mission Boulevard in Riverside to his friend's house. From Rubidoux Boulevard, Vasquez turned his bike down 29th Street. As he proceeded down 29th Street, Vasquez saw a group of people gathered in front of Tolbert's house. Some of that group, about eight individuals, began to move out on the street in front of Vasquez. Included in this group were Green and Tolbert.

3

Recognizing Green and Tolbert from high school where they had all been friends, Vasquez did not initially anticipate a problem and stopped as he came up to the group. When Green said he liked Vasquez's bike and Vasquez responded that it was his, Green said the bike was his color (the bike was blue). At that point, Tolbert grabbed the bike's handle bars. Vasquez's cell phone rang and when he took it out of his pocket, someone in the group said the phone was his color (the phone was blue as well). Someone then unsuccessfully tried to take the phone out of Vasquez's hand. The group, including others from the house, was beginning to close in around Vasquez, cutting off any path of escape. People in the group were moving about, making fists, and cursing.[2] Vasquez described the group as "acting crazy" "like they were ready to get violent or something."

Brady, who had been in front of the house, rode up close to Vasquez, cursed him and mentioned something about a problem between them in the past. Vasquez told him to go away, and he did not want to fight. Brady then swung and hit Vasquez in the side of his head. Vasquez began to back away with his bike as people in the group began shouting threats, yelling "Rubidoux Projects Crips," and swinging punches at him. Vasquez put his bike down and began swinging back. Vasquez was knocked to the ground, but got back up and continued to fight. Multiple people struck Vasquez, but he could not identify any of them except Brady. As he was defending himself, Vasquez saw Brady step back and take a revolver from a member of the group. Brady then approached Vasquez and swung the gun, striking Vasquez in the face and knocking his two front

---

[2]    One of the people in the group surrounding Vasquez was Kevin Washington, a Westside Project Crips gang member.

teeth out. After seeing Vasquez's teeth knocked out, the group allowed him to get on his bike and leave, while yelling threats and gang names.

Riverside Sheriff's Deputy Bryce Holmes testified as an expert on criminal street gangs in the Riverside-Jurupa Valley area. He was familiar with the Westside Project Crips, which he described as a criminal street gang comprised of mostly black males, with approximately 150 members in August 2011, and claiming territory that included 29th Street where the attack on Vasquez occurred. The gang uses several variations on its name, including Rubidoux Project Crips, and its members use hand signs to signify the gang. The gang color is blue.

In Holmes's opinion, the primary activities of the Westside Project Crips are assault and battery, shootings, and drug sales. He described several crimes committed by Westside Project Crips gang members: (1) possession of a handgun and street terrorism by gang member Kevin Washington on March 1, 2010; (2) carrying a loaded firearm by gang member Tyrale Holley; and (3) assault with force likely to cause great bodily injury by gang members Robert Sowell, Jerry Stovall, and Jamaal Duncan.

Based on law enforcement contacts, gang associations and possession of Westside Project Crips gang paraphernalia, Holmes opined that Appellants were each active participants and members of that gang. Holmes described respect as being very important to gangs and gang members and equated respect in that context as being seen as very dangerous. He indicated that gang members earn status and enhance their reputation by committing crimes to benefit the gang, referred to as "putting in work" in the criminal street gang nomenclature. He testified that gang members see strength in

5

numbers, support other gang members, must backup other members, and will join in a fight and escalate the level of violence. He also described a variety of acts of disrespect, which result in retaliation or payback: crossing into the gang's turf; holding back property demanded by a gang member; and fighting back against an attack. Word of gang crimes spreads quickly in gangs and gang members yell out gang names during crimes to strike fear into members of the community and thereby benefit from community members being uncooperative with law enforcement due to that fear.

Based on a hypothetical question mirroring the attack on Vasquez, Holmes opined that the actions of Appellants and other members of their gang benefited, and were committed in association with, Appellants' gang.

Defense

Richard Graham testified he was in Tolbert's front yard and saw Vasquez ride down the street and stop at the curb where Appellants were standing.[3] Shileah Lewis testified she was across the street shooting a basketball with her friend and saw Vasquez ride up and talk to Tolbert and Green.[4] She said Brady was not there initially, but rode up soon afterward. Graham and Lewis described an exchange of words between Vasquez and Brady. Lewis said that after the words were exchanged, Vasquez threw down his

---

[3] Graham had prior felony convictions for drug manufacturing (Health & Saf. Code, § 11379.6) and possession for sale (Health & Saf. Code, § 11351). Brady lived with Graham at some point.

[4] Lewis was dating Jamaal Duncan, denied Duncan was a gang member, and met Brady and Green through Duncan. Holmes identified Duncan as a Westside Project Crips gang member, who, with two other gang members, committed assault with force likely to cause great bodily injury.

6

bicycle and swung at Brady, who fought back. Graham said he had looked away during the verbal confrontation and when he looked back, the two were in a "scuffle" with no one being hit in the eyes, nose, or mouth. During the brief fight, Lewis saw Brady punch Vasquez in the mouth, dislodging a tooth. When Vasquez grabbed his mouth and complained, Brady told him to leave, which he did. Graham also described Vasquez leaving after the fight stopped, but also stated that nothing occurred during the fight that would cause a tooth to dislodge and no one was hurt.

Jesse James testified that a couple of weeks prior to the incident, he and Brady were sitting outside the car at a market, waiting for James's dad, when Vasquez walked up and complained about being stared at by them. Vasquez appeared angry. James said he and Brady laughed at Vasquez.

Green's mother testified about her efforts to keep her son away from bad influences, particularly in light of her older son's association with gang members.

DISCUSSION

I

*COUNT 2*

Brady raises two challenges regarding his conviction under count 2. First, he contends the conviction must be reversed because it is a lesser included offense of count 3, aggravated assault. Second, he asserts if we are not inclined to reverse his conviction under count 2, we must order the superior court to stay his sentence for count 2 per section 654. We reject both these contentions.

7

As a result of a defense motion under section 1118.1, the trial court concluded that the inoperability of the firearm Brady used to knock out Vasquez's teeth undermined any basis for the assault with a firearm charge in count 2 (§ 245, subd. (a)(2)), but the court permitted the prosecutor to amend that count to state a violation of assault with a deadly weapon under section 245, subdivision (a)(1). The trial court then described the basis for the two felony assault counts as arising from different acts:

> "Count 2 is the swinging of the heavy metal object that looks like a gun, and Count 3 is the fists, the beating by hand, and -- I don't think he was kicked but by multiple fists by many people as the group event, whereas the Count 2 is the single swing which broke the teeth."

Consistent with that ruling, the trial instructed the jury that count 2 was "assault with a deadly weapon," which required proof of "an act with a deadly weapon," and that a deadly weapon is "any object, instrument or weapon" that is inherently dangerous or was used in a way capable of and likely to cause death or great bodily injury. As to count 3, the trial court instructed that the offense was "assault with force likely to produce great bodily injury," which required proof of "an act that by its nature would directly and probably result in the application of force to a person, and the force used was likely to produce great bodily injury." As to count 2, the jury convicted Brady of simple assault as a lesser included offense.

Section 954 provides, in part, "[a]n accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts . . . ."

8

Generally, there is no limit to the number of convictions arising from a defendant's act or course of conduct. (§ 954.) But an exception exists for lesser included offenses. "[I]f a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former." (*People v. Lopez* (1998) 19 Cal.4th 282, 288.) In such cases, a defendant may not be convicted of both the greater and the lesser offense. (*People v. Reed* (2006) 38 Cal.4th 1224, 1227.) Put differently, "[t]he law prohibits simultaneous convictions for both a greater offense and a lesser offense necessarily included within it, when based on the same conduct." (*People v. Milward* (2011) 52 Cal.4th 580, 588.)

At trial, the evidence showed that Brady punched Vasquez one time in the side of the head, which instigated the other members of his gang to attack Vasquez with force likely to cause great bodily injury by means of their fists and feet. While that attack was occurring, Brady armed himself with the firearm and struck Vasquez with it, knocking his teeth out. Thus, the jury could reasonably find that Brady aided and abetted in his gang's felonious assault on Vasquez and also perpetrated a separate assault on Vasquez, but without a deadly weapon as alleged. The evidence supports the conclusion, as stated by the trial court, that the two convictions were based on separate acts, and thus, both convictions are proper. Indeed, the prosecutor, during closing argument, asserted these same, distinct facts to support a conviction under both counts 2 and 3. We find no error.

Similarly, we are not persuaded by Brady's argument that the court should have stayed his sentence under count 2 per section 654. Section 654 bars multiple punishments of a single, physical act or omission. Fifty-four years ago, however, in *Neal*

9

*v. State of California* (1960) 55 Cal.2d 11 (*Neal*), disapproved on a different point in *People v. Correa* (2012) 54 Cal.4th 331, 334 (*Correa*), our Supreme Court substantially enlarged the statute's scope. The court, recognizing that few crimes result from a single physical act, adopted a test focusing on whether the defendant engaged in an indivisible course of conduct pursuant to a single intent and objective. (*Neal*, *supra*, at p. 19.) In applying this test, the court inquired whether all of the crimes were incident to one objective (*ibid*.) and whether one crime served as the means of perpetrating another crime (*id*. at p. 20).

Over 30 years later, in *People v. Latimer* (1993) 5 Cal.4th 1203, our Supreme Court criticized the *Neal* test as a " 'judicial gloss' . . . 'engrafted onto section 654' " that can defeat the statute's purpose of matching punishment with culpability. (*Latimer*, *supra*, at p. 1211.) Nonetheless, the court in *Latimer* declined to overrule the *Neal* test because, over the course of three decades at that point, the Legislature had incorporated the *Neal* rule into California's sentencing scheme. (*Latimer*, *supra*, at p. 1205.) In *Latimer*, the court "stressed, however, that 'nothing we say in this opinion is intended to cast doubt on any of the later judicial limitations of the *Neal* rule.' " (*Correa*, *supra*, 54 Cal.4th at p. 336.) Recently, our Supreme Court placed another judicial limitation on the *Neal* rule (*Correa*, *supra*, at p. 344) after recognizing that the *Neal* test "has been a

subject of continuing controversy and given rise to much confusion" (*Correa*, *supra*, at p. 335).[5]

These judicial limitations--intended to better correlate punishment with culpability--have narrowed the application of *Neal's* single intent and objective test. (*Correa*, *supra*, 54 Cal.4th at p. 341.) Of these limitations, the following ones are relevant here. First, courts avoid viewing a defendant's intent or objective too broadly or amorphously. (*People v. Perez* (1979) 23 Cal.3d 545, 552; *People v. Morelos* (2008) 168 Cal.App.4th 758, 769.) Second, courts have recognized the need for flexibility in applying the rule on a case-by-case basis: "[T]here can be no universal construction which directs the proper application of section 654 in every instance." (*People v. Beamon* (1973) 8 Cal.3d 625, 636.) "Notwithstanding the apparent simplicity of its language, the applicability of section 654 in a particular case often involves a difficult analytical problem. [Citation.] Each case must be determined on the basis of its own facts, and general principles applicable to one type of case may not apply to another." (*In re Adams* (1975) 14 Cal.3d 629, 633; see also 3 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Punishment, § 248, pp. 397-399.)

" 'The defendant's intent and objective are factual questions for the trial court' " (*People v. Coleman* (1989) 48 Cal.3d 112, 162), "which is vested with broad latitude in making its determination" (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143). When a

---

5    In *Correa*, the court rejected dictum in a *Neal* footnote and concluded "section 654 does not bar multiple punishment for violations of the same provision of law." (*Correa*, *supra*, 54 Cal.4th at p. 344.)

trial court sentences a defendant for two crimes, without suspending execution of sentence, the judge implicitly finds the acts involved more than one objective. (*People v. Osband* (1996) 13 Cal.4th 622, 730.) The court's findings (express or implied) are subject to the substantial evidence standard of review. (*Jones, supra,* at p. 1443; see *Coleman*, *supra*, at p. 162.) We review for substantial evidentiary support the court's implied findings that neither of defendant's crimes was incidental to the other or the means by which the other crime was accomplished, and that defendant harbored separate intents. (*People v. Andra* (2007) 156 Cal.App.4th 638, 640-641.) We view the record in a light most favorable to the judgment, and presume in support of the court's conclusion the existence of every fact the court could reasonably deduce from the evidence. (*Ibid.*)

Here, as we conclude above, Brady's convictions under counts 2 and 3 were attributable to separate acts. The evidence showed that Brady punched Vasquez one time in the side of the head, which encouraged the other members of his gang to attack Vasquez with force likely to cause great bodily injury by means of their fists and feet. While that attack was occurring, Brady armed himself with the firearm and struck Vasquez with it, knocking his teeth out. Thus, the jury could reasonably find that Brady aided and abetted in his gang's felonious assault on Vasquez and also perpetrated a separate assault on Vasquez. Further, the evidence supports the court's implied finding Brady acted with separate intents: he held a grudge against Vasquez for some past wrong and he wanted to enhance the reputation of his gang, himself, and fellow gang members. As such, section 654 was not violated by the court sentencing Brady to a concurrent sentence for count 2.

12

II

*COUNT 4*

A.  Jury Instructions

Brady, joined by Tolbert, contends the court provided an ambiguous instruction regarding count 4.  Specifically, Brady claims the jury instruction allowed the jury to convict him if he acted alone rather than "*collectively* with gang members."  (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1139 (*Rodriguez*); original italics.)

The trial court instructed the jury on the elements of active criminal street gang activity (otherwise known as street terrorism):

> "To prove that a defendant is guilty of this crime, the People must prove that:
>
> "1.  The defendant actively participated in a criminal street gang;
>
> "2.  When the defendant participated in the gang, he knew that members of the gang engage in or have engaged in a pattern of criminal gang activity; and
>
> "3.  The defendant willfully assisted, furthered or promoted felonious criminal conduct by members of the gang either by directly and actively committing a felony offense or by [] aiding and abetting a felony offense."

The question whether a challenged instruction accurately conveys the legal requirements of a particular offense is one of law which we independently review. (*People v. Waidla* (2000) 22 Cal.4th 690, 733.)  When scrutinizing an ambiguous or purportedly ambiguous instruction under the United States Constitution or California law, we inquire "whether there is a reasonable likelihood that the jury misconstrued or misapplied the words in violation" of such laws.  (*People v. Clair* (1992) 2 Cal.4th 629,

13

663.)  In deciding the issue, we consider the specific language challenged, the whole of the instructions, and the jury's findings.  (*People v. Cain* (1995) 10 Cal.4th 1, 35-36.)  Arguments of counsel may also shed light on whether the jury correctly understood the law as presented by the instructions as a whole.  (See *People v. Kelly* (1992) 1 Cal.4th 495, 526-527.)  Where the jury is misinstructed on an element of the offense, reversal is required unless we are able to conclude that the error was harmless beyond a reasonable doubt.  (*Id*. at p. 527.)

Neither Brady nor Tolbert objected to the instruction as written or requested a clarifying instruction.  A defendant may not contend on appeal that jury instructions are impermissibly ambiguous without first requesting a clarifying instruction at trial.  Failure to make such a request forfeits the claim on appeal.  (*People v. Hart* (1999) 20 Cal.4th 546, 622.)  Accordingly, Brady and Tolbert forfeited their claim.

Nonetheless, Brady urges that we review the issue of asserted instructional error on the merits because it affected his federal due process rights.  However, Brady's argument does not withstand scrutiny.  He does not argue that the street terrorism instruction incorrectly stated the law.  Instead, Brady reiterates that because the instruction was ambiguous, the jury could have interpreted it as allowing it to convict Brady even if he did not commit a felony with another gang member.  Even though Brady attempts to ascribe a constitutional dimension to the allegedly ambiguous instruction, he still fails to show why he did not forfeit this claim by failing to ask for a clarifying instruction.  (See *People v. Hart*, *supra*, 20 Cal.4th at p. 622.)

14

Moreover, even if we analyze the merits of Brady's argument, we nevertheless would reject it. " 'If a jury instruction is ambiguous, we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction.' [Citations.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1202.)  In *Rodriguez*, *supra*, 55 Ca1.4th 1125, our high court interpreted the statutory language of section 186.22, subdivision (a), under rules requiring that it use "the plain, commonsense meaning of the language used." (*Rodriguez, supra,* at p. 1131.)  The court concluded, in light of "the language and grammatical structure of the statute," that "to satisfy the third element, a defendant must willfully advance, encourage, contribute to, or help members of his gang commit felonious criminal conduct." (*Id*. at p. 1132, italics omitted.)

Here, similar statutory language is used in the court's jury instruction with the additional explanation that assisting members of the gang can be done either as a perpetrator or as an aider and abettor.  And the court separately instructed the jury that a person may be guilty either as a perpetrator or as an aider and abettor.  In either case, the instruction on street terrorism requires that the defendant "willfully assist[], further or promote[] felonious criminal conduct by members of the gang."  Accordingly, we conclude the instructional language here does not vary in any significant way from the statutory language, and Brady's claim therefore lacks merit. (See *Rodriguez*, *supra*, 55 Cal.4th at p. 1132.)

### B.  Substantial Evidence

Relying extensively on *Rodriguez*, *supra*, 55 Cal.4th 1125, Appellants argue substantial evidence does not support their convictions for street terrorism under count 4.

15

In *Rodriguez*, our Supreme Court considered whether a defendant violates section 186.22, subdivision (a) "if he commits a felony, but acts alone." (*Rodriguez, supra*, at p. 1128.) The court observed that "to satisfy the third element [of the offense], a defendant must willfully advance, encourage, contribute to, or help members of his gang commit felonious criminal conduct," and concluded "section 186.22[, subdivision] (a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member." (*Rodriguez, supra,* at p. 1132; italics omitted.) The court reasoned: "The Legislature . . . sought to avoid punishing mere gang membership in section 186.22[, subdivision] (a) by requiring that a person commit an underlying felony with at least one other gang member." (*Rodriguez, supra,* at p. 1134.) The court further explained "section 186.22[, subdivision] (a) reflects the Legislature's carefully structured endeavor to punish active [gang] participants for commission of criminal acts done collectively with gang members." (*Rodriguez, supra,* at p. 1139; italics omitted.) A defendant who acts alone does not violate section 186.22, subdivision (a). (*Rodriguez, supra*, at p. 1139.)

Brady claims there is no evidence that he committed a felony with the assistance of at least one other gang member as required under section 186.22, subdivision (a) and as explained in *Rodriguez, supra*, 55 Cal.4th 1125. Tolbert and Green also argue there was insufficient evidence to be convicted under section 186.22, subdivision (a), specifically pointing out that the jury found them not guilty of counts 1 through 3.

The standard of review for a sufficiency of the evidence claim is well established. We review the entire record in the light most favorable to the judgment to determine

16

whether it contains substantial evidence--that is, evidence that is reasonable, credible, and of solid value--from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Steele* (2002) 27 Cal.4th 1230, 1249.) "[T]he substantial evidence rule does not require that the evidence supporting defendant's conviction be direct evidence. For purposes of the rule, substantial evidence encompasses circumstantial evidence and any reasonable inferences to be drawn from such evidence." (*People v. Lopez* (2013) 56 Cal.4th 1028, 1069-1070.) Our assessment is highly deferential to the verdict in that we presume every supporting fact the jury could have reasonably deduced from the evidence. (*People v. Albillar* (2010) 51 Cal.4th 47, 60; *People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 538.) A reversal is not warranted unless the evidence is insufficient to support the verdict under any hypothesis. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Here, Brady bases his insufficient evidence argument on his view of the evidence: he, and he alone, fought Vasquez. This argument, however, ignores much of the evidence adduced at trial that showed several gang members were involved in Brady's attack of Vasquez. Vasquez testified that he was initially confronted on the street by eight people and there were additional people still in front of the house, who moved toward the confrontation as it developed and encircled him, cutting off any avenue of escape. Some of those people were shouting encouragement to Brady to fight Vasquez. After Vasquez was first struck in the side of the head by Brady and began backing up, the people confronting him advanced and said " 'Fuck that fool up. Rubidoux Project Crips.' " Vasquez identified one of the people shouting the gang name as Kevin

17

Washington. Some of the people also started punching Vasquez. When Vasquez hit one of his attackers, more joined in. He was being hit from all sides.

During this attack, Vasquez saw a person pass Brady the gun that Brady used to knock Vasquez's teeth out. That person came from the area of the house and wore a do-rag.

Holmes, the prosecution's expert witness about gangs, identified 29th Street and Tolbert's house on that street as a hangout area for the Appellants' gang. He also identified Washington, a member of the group outside the house, as a gang member.

From this evidence, the jury could reasonably find that the group which surrounded Vasquez and encouraged and participated in Brady's attack were his fellow gang members, who participated in and aided and abetted Brady's crimes. The jury could also find that the person who passed Brady the gun was a fellow gang member. Thus, regardless of the jury's verdicts as to Tolbert and Green, there is overwhelming substantial evidentiary support that Brady committed his crime "*collectively* with gang members." (*Rodriguez*, *supra*, 55 Ca1.4th at p. 1139; original italics.)

In addition, because of the inconsistent verdict doctrine, we are not swayed that Green's and Tolbert's convictions should be reversed by the fact the jury did not convict Green and Tolbert under counts 1 through 3. Section 954 provides, in relevant part: "An acquittal of one or more counts shall not be deemed an acquittal of any other count." In other words, even though an acquittal on one count may be factually irreconcilable with a conviction on another, both verdicts must be credited. (*People v. Abilez* (2007) 41 Cal.4th 472, 513.) "[The] inconsistency may show no more than jury lenity,

18

compromise, or mistake, none of which undermines the validity of a verdict." (*People v. Lewis* (2001) 25 Cal.4th 610, 656 (*Lewis*).) Since the defendant has received the benefit of the acquittal, " 'it is neither irrational nor illogical to require [him] to accept the burden of conviction on the counts on which the jury convicted.' " (*People v. Santamaria* (1994) 8 Cal.4th 903, 911, quoting *United States v. Powell* (1984) 469 U.S. 57, 69.) It follows that an inherently inconsistent verdict will stand on its own if otherwise supported by substantial evidence in the record. (*Lewis*, *supra*, at p. 656.)

Aiding and abetting may be inferred from a defendant's presence at the scene of the crime, companionship with the perpetrator, and conduct before and after the offense, including flight. (*People v. Medina* (2009) 46 Cal.4th 913, 924, citing *People v. Haynes* (1998) 61 Cal.App.4th 1282, 1294.) No one factor is dispositive of the issue, but a combination of these circumstances can satisfy the substantial evidence test. (*People v. Miranda* (2011) 192 Cal.App.4th 398, 407.) In this case, two of the factors support the jury's guilty verdict for both Tolbert and Green.

Green and Tolbert were both present and among the group when Vasquez was attacked. Green said he liked Vasquez's bike, and Tolbert put his hand on the bike. Brady subsequently caused serious injury to Vasquez by knocking his front teeth out. Whatever the jury saw as to Green and Tolbert's participation in Brady's actions, it could easily see them as far less culpable and returned its acquittals under counts 1 through 3 on that basis. (See *People v. Abilez, supra,* 41 Ca1.4th at p. 512 [difference in relative culpability explains apparently inconsistent verdicts].)

19

Further, although Vasquez was not able to identify Green and Tolbert as striking him when he was surrounded by the gang and was hit, knocked to the ground, and one person attempted to kick him, it was plain from the evidence that they took an active role in surrounding Vasquez, which facilitated the blows from gang members that he did suffer separate from the particular blows delivered by Brady. Thus, the evidence substantially supports the street terrorism verdicts on the basis of the felonious assault against Vasquez by unidentified assailants who were members of Green and Tolbert's gang. As the evidence supports the conclusion that the general felonious assault on Vasquez was committed by Green and Tolbert "*collectively* with gang members" (*Rodriguez*, *supra*, 55 Ca1.4th at p. 1139; original italics), the verdicts are supported by substantial evidence.[6]

III

*SPECTATOR MISCONDUCT*

Brady, joined by Tolbert, contends the trial court erred in failing to grant a mistrial following an act of what Brady describes as "juror misconduct." We disagree with both the characterization of the misconduct as well as the argument that the trial court erred and conclude the trial court did not abuse its discretion.

---

[6] Appellants ask us to disregard much of the testimony in support of Vasquez's version of events, arguing that his testimony was inconsistent. They then point out that the various defense witnesses stated the fight was only between Brady and Vasquez. These arguments go to the weight of the evidence. Essentially, Appellants request that we engage in a credibility determination and reweigh the evidence in their favor. This we cannot do, especially in a substantial evidence review. (See *People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

A. The Spectator's Interaction With the Jury

At the beginning of the afternoon session on July 12, 2012, the trial court reported that three jurors had approached the court clerk with information that spectators in the hallway were seen using their cell phones to take pictures of jurors. The trial court, in the presence of counsel and Appellants, questioned each juror and the alternate juror individually. Seven of the jurors--Nos. 3, 4, 6, 7, 8, 10, and 11--and the alternate juror knew nothing about an unusual occurrence involving a spectator.

Three jurors--Nos. 5, 1, and 12--saw a female in the hallway holding a cell phone in a manner consistent with taking a picture of jurors, and two jurors--Nos. 2 and 9--had heard about it. All five expressed some level of concern about the incident, and also indicated the incident would not affect their ability to be fair and impartial.

Juror No. 5 reported that while the jurors were outside in the hallway in the morning, waiting for the day's proceedings to begin, she saw a young thin African-American woman with medium length hair, who had previously been in the audience in the courtroom, holding up her phone as if she were taking pictures of some of the jurors. When asked about how she felt about it, Juror No. 5 replied: "I'm kind of--I don't want to say paranoid, but I'm pretty conscious about surroundings a little bit more." The court informed Juror No. 5 that extra precautions would be taken, and it asked if she thought it would affect her ability to be an objective juror. Juror No. 5 responded, "I don't think it will affect me. It makes me more aware of our surroundings." She also said that she was "pretty neutral right now." The court told the juror that the Appellants had nothing to do with what had occurred.

21

Juror No. 2 did not see anything and learned about the incident from Juror No. 5. Juror No. 2 found it alarming and upsetting, but acknowledged the action "could be absolutely nothing" but "felt it was enough to bring" it to the court's attention. Juror No. 2 stated she could "absolutely" still be objective and neutral and give each side a fair hearing and decision.

Juror No. 9 also did not see the incident, but heard about it. He was fearful for his safety and expressed doubts about his ability to take care of himself outside the courtroom, especially when traveling on the bus to and from the courthouse. However, he had arranged for rides to and from court so he could avoid the bus and was "confident" the incident would not affect his ability to be a fair juror in any way.

Juror No. 1 saw a female in the hallway raise a cell phone, but thought nothing about it. Juror No. 1 felt the female could have been texting or taking a picture, it occurred one time, and the cell phone was pointed "kind of toward" her (Juror No. 1) and two other jurors. Juror No. 1 was "fine" and the incident was "not going to sway [her] either way, guilty or not."

Juror No. 12 indicated she saw a female witness holding her cell phone out about eye level. She thought the woman was texting, but did not know if the phone was in camera mode. She stated that after she had been "told about it" it was "uncomfortable" and "intimidating." The court asked if it would affect her ability to be a juror, to which the juror replied, "Umm, I don't think so," and, "No." The juror subsequently represented that she would "still be fair," make her decision based on what occurred in the courtroom, and set aside the incident.

22

Juror Nos. 3, 4, 6, 7, 8, 10, and 11 each informed the court that they had no knowledge of the occurrence of anything inappropriate in the hallway. The court did not inform these jurors of what had occurred.

Green's trial counsel moved for a mistrial. In doing so, he summarized the statements of Juror Nos. 2, 5, and 9. He also emphasized his belief that the jury would bring up the spectator's actions during deliberations and there probably was not a remedy for it. He also stated that the jurors could not be fair even though they said they could be, and as a result, his client's Sixth Amendment rights would be violated unless the motion for mistrial was granted.

Tolbert's trial counsel also addressed the court, noting that "it's a close call." Counsel continued to explain that the situation was made more difficult because the spectator allegedly taking pictures was a potential witness and "there were people identified by the gang officer as active gang members that came in at or around the same time as the person accused of this."

Brady's trial counsel joined in the motion for a mistrial. He pointed out that the person they believed was the one with the phone in hall was a potential defense witness. Counsel pointed out that two of the jurors did not or could not make eye contact with the defense and the voice of one of the jurors was shaking. In addition, Brady's trial counsel argued the jurors had discussed the incident with each other despite the court's instruction not to do so. Because of this, Brady's counsel asserted, "So I don't see how we can now, in good faith, believe that we're gonna be able to give them an instruction

23

to disregard, don't let it affect you, what have you, and expect them to follow it when they've blatantly demonstrated they are not able to do so."

Following the hearing, the trial court denied the motion for a mistrial, explaining:

"The level of apprehension that some jurors are feeling right now I don't believe is significantly different than all 12 jurors were feeling in this case and every other gang case. It's there in every gang case. Some jurors express it. Some jurors don't express it. I don't see this event which took place in the hallway that was apparently personally seen by three, and maybe three others have been told about it, changes that. Particularly in light of the fact that all of them have assured us that it will not affect them."

The court also gave the following explanation to the jury:

"Ladies and Gentlemen, let me tell you a few things. One, as I've told each of you individually, there was a suggestion that something took place in the hallway that was inappropriate, and I've talked with all of you. Some of you know what I'm talking about and some of you don't. Those of you that don't know what I'm talking about, I'm going to say this much. There was something that happened, conduct which may have been completely innocent and may have been inappropriate. It's ambiguous about what happened. We don't know exactly what happened. But there was something ambiguous, and it was, I think, appropriate that it was brought to my attention. And we are going to do some things different from now on.

"Where you have just spent the last few minutes, it's normally a jury deliberation room. Well, now it's going to be a jury deliberation room and a juror break room. Whenever we take breaks or things like that, you won't go out that door. You'll go out this door and just spend your break there were you just came for the rest of the trial. That's just a precaution because we are precautionary people. That's kind of like what we do.

"So that's all we're gonna do right now. We are gonna proceed. For those of you who don't know what we're talking about, I'll put your mind at rest this much. I promise I will tell when the case is over so you won't forever wonder what it is we're talking about. I'll tell you when the case is over, and you will be caught up to speed. All right? And that's it for right now.

24

"Unless someone feels they have a burning desire to talk to me some more, based on anything else, then we are going to continue on at this time. We're not gonna make any change as far as spectators coming into the courtroom . . . but, again, they will be in one spot during breaks; you folks will be in a different spot during breaks. But we are not making any changes as far as who can come in and things like that. All right?

"And with that I'm going to ask to go ahead and let the spectators into the courtroom."

## B. Analysis

As a threshold matter, we address Brady's characterization of what occurred with the jury during trial. Brady refers to this matter as one of juror misconduct and asks us to apply a rebuttable presumption of prejudice. (See *People v. Nesler* (1997) 16 Cal.4th 561, 578.) However, this is not a case of juror misconduct. No jury member obtained information from an extraneous source and shared it with his or her fellow jurors. (See *id*. at p. 579.) Nor did any juror, during voir dire, fail "to disclose everything she had read, seen, heard, or said about [the defendant's] case, and whether any such exposure caused her to form an opinion of [the defendant's] guilt or innocence." (*In re Hamilton* (1999) 20 Cal.4th 273, 297.) And no juror received information outside of court about the pending case and discussed that information with nonjurors. (See *In re Carpenter* (1995) 9 Cal.4th 634, 647.) Although these are but a few examples of juror misconduct, they indicate the general characteristics of juror misconduct: a juror learns of information regarding a pending case beyond what is presented at trial and then uses that information during deliberations, provides the information to his or her fellow jurors, or

25

discusses it with nonjurors.  There is no evidence in the record that any juror here engaged in any such conduct.

Instead, this is a matter of potential spectator misconduct.  A spectator's conduct is grounds for reversal if it is " 'of such a character as to prejudice the defendant or influence the verdict.' [Citations.]" (*People v. Myles* (2012) 53 Cal.4th 1181, 1215.) "The trial court has broad discretion to ascertain whether a spectator's actions were prejudicial." (*Ibid.*)

Here, the trial court was able to observe the jurors' demeanors when discussing the incident with them individually.  As to each of the five jurors who had seen or heard about the incident, the trial court reminded them of their duty of fairness and received their assurances that they could remain fair and impartial.  The trial court found the jurors credible and denied the motion for mistrial "particularly in light of the fact that all of them assured us that it will not affect them."

Without the presumption of prejudice, Brady's argument amounts to little more than a claim that the trial court was wrong to believe the jurors who stated they would not be influenced by the spectator's actions.  However, the court's favorable credibility finding is entitled to deference.  (See *People v. Zapien* (1993) 4 Cal.4th 929, 994.) Without more to support Brady's position, we are satisfied that the court did not abuse its discretion in denying the mistrial motion.

DISPOSITION

The judgment is affirmed.


HUFFMAN, Acting P. J.

WE CONCUR:


HALLER, J.


IRION, J.

27